In the Matter of Foster Care Status of KIM WALKER and Others. JOHN BRYANT et al., Respondents; COMMISSIONER OF SOCIAL SERVICES OF THE CITY OF NEW YORK et al., Appellants.

First Department, June 29, 1982

**APPEARANCES OF COUNSEL**

*Trudi Mara Schleifer* of counsel (*Leonard Koerner* with her on the brief; *Frederick A.O. Schwarz, Jr., Corporation Counsel,* attorney), for Commissioner of Social Services of the City of New York, appellant.

*William J. Manning* of counsel (*Roy L. Reardon, Edward J. Nowak* and *John N. O'Shea* with him on the brief; *Simpson Thacher & Bartlett,* attorneys), for Spence-Chapin Services to Families and Children, appellant.

*Stanley A. Bass* of counsel (*Mark H. Spires,* attorney), for respondents.

*Susan Larabee* of counsel (*Kay McNally* with her on the brief; *Lenore Gittis,* attorney), as Law Guardian for the children.

OPINION OF THE COURT

MILONAS, J.

Appellants Spence-Chapin Services to Families and Children (Spence-Chapin) and the Commissioner of Social Services of the City of New York appeal from two orders of the Family Court which, in part, stayed adoption of the subject children, ordered a fair hearing on the propriety of their removal from their foster home and directed a foster care hearing to determine whether the placement of the children with an Oregon couple was in their best interests.

The instant matter involves three black children, Kim Walker, who was born on January 2, 1971, David Pitman, born on July 16, 1972, and Virginia Parris, who was born on July 21, 1973. Spence-Chapin placed them as infants in foster care with a black Queens couple, John and Lillie Bryant. Subsequently, the children were all freed for adoption, and the Bryants, who had indicated their desire to adopt even prior to the termination of parental rights, applied. Initially, the agency favored adoption by the Bryants and, in the course of various court proceedings, expressed their support for such a plan. Spence-Chapin's records were replete with praise for the quality of the Bryants' parenting skills, and, in fact, the agency had been sufficiently impressed to permit them to adopt two other children. Thus, it was not until early of 1978 that Spence-Chapin began to raise doubts about the suitability of the Bryants as adoptive parents based upon their health, ages (Mr. Bryant was born in 1910 and Mrs. Bryant in 1915) and the special needs of the children.

On June 11, 1979, the Social Services Department, after consultation with Spence-Chapin, disallowed the Bryants' application. They were advised of this decision in August of 1979 by a Spence-Chapin administrator who explained to the disappointed couple that they would be able to keep the children until an adoptive home could be found. He did not inform them of the procedures for appeal and apparently stated that it was unnecessary for them to go to court.

Shortly thereafter, the children were photo-listed as a family unit in the New York State Adoption Exchange. In March of 1980, Spence-Chapin received a request for a subsidized adoption through PLAN, a private adoption agency in Oregon. David and Becky McMurrick, a relatively young white couple living in a small, white working community in Oregon's forest country, had demonstrated an interest in adopting all three children. The application of the McMurricks, who have two children of their own and have adopted a third Korean child, was rejected by the Commissioner of Social Services in a letter dated May 28, 1980. According to the commissioner, while the McMurricks "are an unusual family", the adoption would not be in the best interests of the children since the area in which they reside "tends not to be receptive to blacks. This would place an undue burden on the children, who would be socially isolated or ostracized." However, the commissioner reversed his determination after PLAN filed a Federal reverse discrimination complaint with the Civil Rights Office of the Department of Health and Human Services and some prominent public officials allegedly intervened.

On August 28, 1980, a Spence-Chapin caseworker visited the Bryant house in order to present them with some forms to sign for the children's removal. She was unsuccessful in reading the documents to them. The Bryants, angry and upset, refused to listen or to sign the forms or even to accept the copies which she offered to leave behind. Therefore, it is unclear that the couple were ever notified of their right to an independent review pursuant to 18 NYCRR 431.10. There is also no indication that the agency complied with departmental regulations mandating mailed notice.

During September of 1980, Spence-Chapin conducted therapy sessions with the children in an effort to assist them in dealing with the emotional disturbance resulting from the prospect of their imminent relocation. Meanwhile, the Bryants retained an attorney to protest the impending removal. Spence-Chapin responded by letter dated September 26, 1980, in which it stated that since the Bryants had failed to exercise their rights within the specified time period, the agency would continue with its

plans regarding the children. The children were then taken from the Bryant home on October 1, 1980 and turned over to the McMurricks.

Spence-Chapin did not report its actions to the Family Court, and, in the case of Kim Walker, there was a specific order that the court be informed of any change in placement. Moreover, although long overdue, no judicial review of the foster care status of the children was sought or convened (Social Services Law, § 392). However, in January of 1981, the Family Court, after being alerted to the situation, recalendared the matter in its foster care review term. Spence-Chapin and the commissioner, opposed by the Bryants, moved to dismiss on the ground that the court lacked jurisdiction to proceed. On March 17, 1981, the court rendered a decision, one of the two being appealed here, which held that the children were still in foster care and thus subject to its continuing jurisdiction. The court further concluded that there existed a genuine and substantial issue of fact as to whether or not the former foster parents had been advised of their rights and, thus, directed a fair hearing with respect to the children's removal. The proposed adoption was stayed pending the outcome of the hearing.

Following a further series of motions, orders to show cause, replies and appeals, the fair hearing finally commenced on April 3, 1981 and ended on May 4, 1981. The ensuing determination dated July 31, 1981, declared that the removal of the children from the Bryants' care was not a proper subject of review since none of the parties had requested the Family Court to order a fair hearing, and the Bryants had admitted to the Administrative Law Judge that they had not demanded a hearing within the 60-day statutory time period. Thereafter, the commissioner and Spence-Chapin renewed their motion to dismiss, arguing that the only relevant issue having now been resolved, the Family Court had no reason to hold a hearing pursuant to section 392 of the Social Services Law. The court denied the motion pending submission of papers by all of the parties and appointed separate counsel for the children. The Legal Aid Society, as Law Guardian, undertook its own inquiry into the children's circumstances. Its investi-

gation revealed that although the children appeared to be adjusting well to what was unquestionably a decent family, they were still suffering from the pain of having been removed from their former loving home. In addition, the children were perceived to be virtually isolated from members of their race and cultural background, a situation which was characterized as creating potentially serious future problems. Therefore, believing an impartial judicial review by the Family Court to be both necessary and proper, the Law Guardian opposed the motion to dismissed.

On December 3, 1981, the Family Court denied the motion to dismiss, finding that there had been no review of the foster care status of the children within two years of the previous hearing as required by subdivision 10 of section 392 of the Social Services Law and that because the children were still in foster care, they remained subject to the jurisdiction of the Family Court. The court also asserted that Spence-Chapin had not offered any reports on the children's status or progress in Oregon, and, before any adoptions could take place, the court and the Law Guardian should be furnished with any and all information concerning the children. Although the court expressed its dissatisfaction with the Administrative Law Judge's opinion that the Bryants' failure to comply with the time limitations of the Social Services Law should be dispositive of the issue of the propriety of the children's removal, it was particularly concerned with whether the children's interracial placement in a small Oregon town was in their best interests. Accordingly, several questions had been raised which could only be resolved by a full inquiry into their present foster care status. The court then ordered a prompt section 392 hearing and continued the stay of the adoptions.

On appeal, Spence-Chapin and the commissioner contend that the Family Court lacks subject matter jurisdiction to hold a section 392 hearing since the children, having been placed in an adoptive home, are no longer in foster care. It is their position that the purpose of this provision is "to facilitate the release of foster children for adoption or the early resumption of the natural home environment" (Memorandum of Adoptive Parents Com-

mittee, Inc., NY Legis Ann, 1970, p 32). A section 392 review, they argue, is only appropriate where children remain in foster care, not where they are already in an adoptive home. Appellants further claim that a section 392 hearing is not the proper forum for the Bryants to present their grievances on the subject of whether they received notice of their right to a preremoval review or whether the Family Court was mislead during prior proceedings or whether someone other than the Family Court had a duty to petition for another foster care examination.

The Bryants' only remedy, appellants allege, is one which the Bryants have already rejected in their posthearing submissions; that is an administrative hearing under section 400 of the Social Services Law and review thereafter by way of a CPLR article 78 proceeding. Finally, appellants assert that it was an abuse of discretion to order a foster care hearing in this particular case.

Clearly, the proper procedural mechanism for foster parents to controvert an agency's action in removing a child from their home is pursuant to the statutory scheme created for this purpose by the Legislature. Under section 400 of the Social Services Law, the foster parents may request an internal review in the form of a "fair hearing", and, upon exhaustion of the administrative remedy, may institute a CPLR article 78 proceeding (*People ex rel. Ninesling v Nassau County Dept. of Social Servs.*, 46 NY2d 382; see, also, *Matter of O'Rourke v Kirby*, 54 NY2d 8). If the administrative agency committed error in deciding that the removal of the children from the Bryants' care was not an appropriate subject of review, and the Family Court Judge did express his displeasure with the ruling, then the Bryants should have commenced a CPLR article 78 proceeding to challenge that determination. The Bryants, however, for whatever reason, elected not to pursue such a course. Yet once the children were taken from the Bryant home, both section 374-a (which deals with the interstate placement of children) and section 392 of the Social Services Law became unavailable to them in order to test the propriety of the removal itself.

Appellants, and also the Bryants, largely fail to distinguish between the removal of the children from their foster

family, on the one hand, and their placement with prospective adoptive parents, on the other. Subdivision 3 of section 383 of the Social Services Law provides that: "Foster parents having had continuous care of a child, for more than eighteen months, through an authorized agency, shall be permitted as a matter of right, as an interested party to intervene in any proceeding involving the custody of the child." Included within the purview of "any proceeding" is an out-of-State adoption. Thus, while the Bryants are clearly an interested party, their right to participate would, of course, be subject to the laws governing the State in which the adoption occurs. Subdivision 3 of section 383 also states that the "final determination of the propriety of said adoption of such foster child shall be within the sole discretion of the court" (see, also, *Matter of O'Rourke v Kirby, supra,* p 13). The issue then is whether the Family Court has subject matter jurisdiction over what would, in effect, constitute a preadoption review.

Spence-Chapin and the commissioner would restrict the coverage of section 392 to current foster care placement, thus leaving an interval between the termination of foster care and the actual adoption during which the court would have no supervisory authority. Under this theory, an agency can simply transfer children from a foster home to a situation which may or may not mature into an adoptive placement, and many do not, and the court is without power to review its actions. The children therefore lose the protections provided by court scrutiny, despite the fact that they may remain in that "adoptive" placement for months or possibly years and regardless of whether the new environment into which they have been thrust is conducive to their best interests.

In the instant case, Spence-Chapin, without notifying the court and without having initiated a review of the children's foster care status well beyond the 24-months maximum period prescribed in subdivision 10 of section 392 of the Social Services Law, abruptly uprooted the children from the admittedly loving and integrated structure in which they had lived most of their lives and sent them off to a small Oregon community where they would be isolated from members of their cultural and ethnic

background. The commissioner at first flatly rejected this plan and only reversed himself apparently in response to outside pressure and not largely based upon consideration of the children's welfare. Throughout this entire affair, Spence-Chapin has resisted, and, continues to resist, all attempts by the Family Court to convene review proceedings.

Subdivision 2 of section 392 requires an authorized agency to file a petition in the Family Court where a child has remained in foster care for a continuous period of 18 months. However, under subdivision 10 of section 392: "The court shall possess continuing jurisdiction in proceedings under this section and, in the case of children who are continued in foster care, shall rehear the matter whenever it deems necessary or desirable, or upon petition by any party entitled to notice in proceedings under this section, but at least every twenty-four months."

An examination of subdivisions 2 and 10 in conjunction with each other raises the question of whether the agency has the affirmative duty of bringing on a section 392 hearing every 18 months or whether once there has been an initial foster care review, the court, possessing continuing jurisdiction, is responsible for initiating a follow-up review whenever it deems necessary or desirable but at least every 24 months. Spence-Chapin asserts that it was not under an obligation to commence a new section 392 proceeding. Yet, subdivision 10 in no way conflicts with, or shifts to the court, subdivision 2's requirement that the agency must institute a review wherever a child has remained in foster care for a continuous period of 18 months. The agency is mandated to seek a section 392 review every 18 months; however, the court has continuing jurisdiction in the matter and may on its own rehear the matter whenever it deems desirable or necessary but must do so at least every 24 months (presumably when there has been a failure of the authorized agency or foster parents or parents, who are all named in subdivision 2, to commence the proceeding). The statute cannot reasonably be interpreted in a manner that would, once the initial section 392 hearing has been held, relieve an agency which has custody, guardianship or supervision of a child from the responsibil-

ity of keeping the court periodically informed of any changes in his or her foster care status by commencing a new review and mandate, instead, that the court assume that obligation in the first instance.

Spence-Chapin, having failed to discharge its statutory duty under section 392 of the Social Services Law, now disputes the subject matter jurisdiction of the Family Court since the children are allegedly no longer in foster care. However, article V(a) of the Interstate Compact on the Placement of Children (Social Services Law, § 374-a, subd 1) declares that: "The sending agency shall retain jurisdiction over the child sufficient to determine all matters in relation to the custody, care, treatment and disposition of the child which it would have had if the child had remained in the sending agency's state, until the child is adopted, reaches majority, becomes self-supporting or is discharged with the concurrence of the appropriate authority in the receiving state."

Therefore, until the children are adopted or meet any of the other criteria enunciated in the foregoing provision, Spence-Chapin possesses ongoing jurisdiction over them. Similarly, the Family Court retains continuing jurisdiction to review both the status of children who are in foster care and those who have been removed from foster care and are now in prospective adoptive homes. Even assuming that the distinction between "foster care" and "adoptive placement" has any significant relevance to the issue under consideration here, which is doubtful, subdivision 10 of section 392 gives the Family Court "continuing jurisdiction in proceedings under this section *and, in the case of children who are continued in foster care,* shall rehear the matter" (emphasis added). In view of the limitation contained in the second clause, the first clause must be read as including children who are no longer in foster care. Any other interpretation of the statute would be contrary both to the purposes for which this law was enacted and to t᠄ wording of subdivision 10. (See *Matter of Stokes v Stok*᠄ 63 AD2d 949, wherein the court cited subdivision 10 of section 392 of the Social Services Law in reversing the Family Court's denial of a motion by the former foster

parents to reopen the proceedings after the child had already been returned to the natural mother.)

In the long contentious struggle between the various parties involved in this case, it seems that the welfare of the children has received the least attention. Spence-Chapin may have been concerned with vindicating its right to dispose of the children as it saw fit without having its actions subjected to court scrutiny. It is now past time that a full inquiry be undertaken, at which all the interested parties, including the former foster parents, will have an opportunity to participate, in order to ascertain what is in the children's best interests.

Accordingly, the appeal from the order of the Family Court, New York County (RAND, J.), dated March 17, 1981, should be dismissed without costs as superseded by the order of December 3, 1981. The order dated December 3, 1981 (RAND, J.), which denied the motion to dismiss the instant petition, directed a hearing pursuant to section 392 of the Social Services Law, stayed the adoption of the subject children pending the outcome of such hearing, and directed that Spence-Chapin make available to the Law Guardian any and all reports in its possession regarding the children, should be affirmed without costs.

MARKEWICH, J. (dissenting). I dissent, and would reverse and dismiss. The majority of this court would place its imprimatur upon the use of section 392 of the Social Services Law ("Foster care status; periodic family court review") for a purpose it was never intended to fulfill. The foster parents of the subject children, who claim to have been aggrieved by a decision of the Department of Social Services to remove the subject children from foster care and place them for adoption elsewhere, were advised timely by Social Services that they, being "aggrieved by such decision of a social services official," might "appeal to the department [of Social Services] pursuant to * * * section twenty-two of this chapter." (Social Services Law, § 400.) Section 22 of the Social Services Law provides for administrative hearing, reviewable in turn in accord with the usual procedure pursuant to CPLR article 78. No such review was ever sought timely and the foster parents had thus come to a dead end in the road. And, it may be stated

parenthetically, considering the matter other than procedurally, that the department had solid reasons for the removal, inclusive of the health of the foster parents. But this is of no moment for, having omitted, whether negligently or purposefully, to seize the opportunity for administrative review, the foster parents' opportunity for such review under section 22 had vanished.

Family Court has the right — indeed, the obligation — to review *ongoing* foster care, under section 392 of the Social Services Law, not foster care which has already been terminated. That court cannot intervene in such a situation to effectively thwart a decision by the department in the manner here attempted after the agency, to the care of which the children had been given by the department, had completed arrangements for their out-of-State adoption under conditions deemed by the department to be favorable to the children's development.

"Pursuant to the statutory scheme created by the Legislature (Social Services Law, § 400), a foster parent aggrieved by a determination of the Social Services Department to remove a child from a foster home may request an internal review of the determination within the department in the form of a 'fair hearing'. Upon the exhaustion of this administrative remedy, an aggrieved foster parent may seek judicial review of the agency's determination in the Supreme Court through the vehicle of an article 78 proceeding. (See, e.g., *Matter of Mundie v Nassau County Dept. of Social Servs.,* 88 Misc 2d 273; *Matter of Ida Denise W.,* 77 Misc 2d 374.)" (*People ex rel. Ninesling v Nassau County Dept. of Social Servs.,* 46 NY2d 382, 386.) Such a proceeding is the proper procedural mechanism by which to review agency action in relation to removal, as well as denial of consent to adoption by foster parents. (*Matter of O'Rourke v Kirby,* 54 NY2d 8, 14.) Faced with the foster parents' failure to timely request a section 400 fair hearing, the Family Court could not under section 392 create a forum for the foster parents to air their grievances. That section is merely a vehicle for reviewing foster care, "care provided a child in a foster family free or boarding home, group home, agency boarding home, child care institution, health care facility or any combination thereof" (Social

Services Law, § 392, subd 1). The foster care status of the subject children was effectively terminated when, more than three months prior to the institution of this proceeding, they were removed from the foster home and placed in the adoptive home.

Accordingly, that part of the order (RAND, J.) entered March 17, 1981, Family Court, New York County, which directed that there be full disclosure of information between all parties should be dismissed as moot, and that part of the order which stayed the adoption proceedings pending a fair hearing should be dismissed as subsumed in the later order of that court entered December 3, 1981. The order entered December 3, 1981, which directed a section 392 hearing and which stayed the adoption, should be reversed and the petition dismissed.

SANDLER, J. P., and FEIN, J., concur with MILONAS, J.; SULLIVAN and MARKEWICH, JJ., dissent in an opinion by MARKEWICH, J.

Order, Family Court, New York County, entered on December 3, 1981, affirmed, without costs and without disbursements. Appeal from order of said court, entered on March 17, 1981, dismissed, without costs and without disbursements, as said order was superseded by the order entered December 3, 1981.